**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Dec 09 2013, 9:57 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JILL M. ACKLIN**
Acklin Law Office, LLC
Westfield, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**PATRICK M. RHODES**
Indiana Department of Child Services
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF B.R., MINOR CHILD AND HIS FATHER, V.R. | ) ) ) ) ) |
| V.R., | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) No. 49A04-1304-JT-156 ) |
| MARION COUNTY DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner and CHILD ADVOCATES, INC. | ) ) ) ) |
| Appellee-Guardian Ad Litem | ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn A. Moores, Judge
The Honorable Larry E. Bradley, Magistrate
Cause No. 49D09-1211-JT-44265

**December 9, 2013**
**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

V.R. ("Father") appeals from the involuntary termination of his parental rights to B.R. In so doing, Father challenges the sufficiency of the evidence supporting the trial court's judgment.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On November 7, 2011, the Marion County Department of Child Services ("MCDCS") filed a petition alleging that B.R., who was born on January 22, 2011 and was the son of Father and B.N.S. ("Mother"), was a child in need of services ("CHINS"). In particular, the CHINS petition set forth that Mother failed to provide B.R. with a safe, stable, and appropriate living environment, and that Mother had mental health issues that had not been adequately addressed and which seriously hindered her ability to appropriately parent B.R. The CHINS petition alleged that Father had not successfully demonstrated the ability and willingness to appropriately parent B.R. and that Father was incarcerated at that time. That same day, B.R. was removed from Mother's home and was placed in the care of his maternal grandmother ("Maternal Grandmother"). Mother was authorized to live in Maternal Grandmother's home as well.

On January 30, 2012, after Father had admitted that B.R. was a CHINS because of Father's domestic violence against Mother, the juvenile court adjudicated B.R. a CHINS. Father also agreed to voluntarily participate in services provided to him. The juvenile court's dispositional order, as it pertained to Father, required Father to establish paternity of B.R., removed B.R. from Father's care, authorized Father to have increased parenting time, and maintained placement of B.R. with Maternal Grandmother.

2

Several hearings were held to monitor the progress of the permanency plan, which at that time was reunification of B.R. with Mother and Father. At a review hearing held on April 30, 2012, MCDCS reported that Father was participating in services, but remained unemployed and did not have housing. The juvenile court held a hearing on an emergency motion for authorization to suspend Father's parenting time on May 21, 2012. Mother alleged that Father had committed an act of domestic violence against her by burning her, and that he had done so while on probation for previously battering her. Father, who became disruptive and upset during the hearing, had to be removed from the courtroom. The juvenile court did not suspend Father's parenting time, but required visits with B.R. to be supervised, and ordered Mother and Father not to have contact with each other without approval from the juvenile court. MCDCS reported at a review hearing held on July 30, 2012 that Father was participating in some services, but not in others. The juvenile court ordered MCDCS to refer services to Father again.

The juvenile court held a permanency hearing on November 5, 2012. MCDCS reported that Father had not completed services that had been referred to him, that Father had been in and out of jail, and that he was once again incarcerated. Although the juvenile court ordered that Father's services remain in place, B.R.'s permanency plan was changed to adoption. On November 15, 2012, MCDCS filed a petition to terminate the parent-child relationship of B.R. with both Mother and Father.

A periodic review hearing was held on February 4, 2013, at which MCDCS provided a progress report. As it relates to Father, the report showed that he had been referred for services by both MCDCS and through probation, but Father had failed to

3

follow through with those services, which were closed out as unsuccessfully completed. Father had been incarcerated during the case and at that time was on house arrest. Father's probation had also been revoked. The juvenile court found that the circumstances causing B.R.'s removal from Father's care had not been alleviated and reaffirmed that B.R.'s permanency plan was for adoption.

Prior to an evidentiary hearing, which was held on March 7, 2013, Mother executed consents for B.R. to be adopted. Although Mother did not appear at the evidentiary hearing, Father appeared at the hearing with counsel. The juvenile court took the matter under advisement and later issued its ruling terminating the parent-child relationship of Father and B.R. Father now appeals from that order.

## DISCUSSION AND DECISION

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Father's parental rights, the juvenile court entered specific findings and conclusions. When a juvenile court's judgment contains specific findings of

4

fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *K.S.*, 750 N.E.2d at 836.

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B)　　that one (1) of the following is true:

(i)　　There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)　　There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

5

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the juvenile court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis supplied).

At the outset, we observe that Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *See e.g. L.S.*, 717 N.E.2d at 209. Although we need only address one of the three requirements, we will address each of the requirements that are challenged by Father.

When making such a determination, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history,

6

drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The trial court may also consider any services offered to the parent by the county department of child services, here, MCDCS, and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Moreover, the MCDCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *See In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

While a parent's fitness to care for a child must be judged at the time of the termination hearing and take into consideration evidence of changed conditions, the parent's habitual patterns of conduct must also be evaluated in order to determine the probability of future neglect or deprivation of the child. *In re D.D.*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004). "A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *McBride v. Monroe Cnty Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). "Moreover, a trial court 'can reasonably consider the services offered by the [MCDCS] to the parent and the parent's response to those services.'" *Id.*

Father challenges whether MCDCS sufficiently proved that a continuation of the parent-child relationship posed a threat to B.R.'s well-being and that the reasons for B.R.'s removal will not be remedied.

The evidence presented at the evidentiary hearing established that while MCDCS wanted Father to participate in home-based counseling and a domestic violence program due to the history of domestic violence between Father and Mother, Family Case Manager Rebecca Prather ("FCM Prather") heard about and observed Father's anger and his ability to be dangerous. Maternal Grandmother had observed instances of Father's erratic and violent behavior. For example, Father was sitting in his car in front of Maternal Grandmother's house when she observed him shatter his car window by banging his head against the window while listening to rap music. Father would stand in front of Maternal Grandmother's house at 3 a.m. and call out for Mother. Father had kicked in the door of Maternal Grandmother's house, and he and Mother would argue with each other.

Father's home-based therapist, Christopher Houston ("Houston"), who had worked with Father beginning in March 2012, testified that he had expressed to Father the need to take medication for his depression, anxiety, and anger management. Houston described the relationship between Mother and Father as one involving chaotic behavior, jealousy, and anger. Houston testified that at one point a bomb had been placed on the porch of the family home; that Father had run out in front of a car and was struck because he was angry with Mother; that Mother and Father had other people follow the other parent around; and that Mother and Father hid on roofs and in trees, which suggested stalking-like behavior.

While in therapy, Father described his relationship with Mother as a toxic one, but that he had difficulty with the notion of moving on from that relationship. MCDCS had instructed Father not to reside in Mother's home, but he continued to do so, and occasionally met with his home-based therapist in Mother's home.

In May 2012, when Father was on probation for battery against Mother, Mother reported an instance of domestic violence between the two. Mother told her home-based therapist and FCM Prather that Father had burned her with lighter fluid. Mother showed FCM Prather the burns on her chest. A few days after the incident, FCM Prather found an open can of lighter fluid in the kitchen. Mother reported that Father indicated he would have also burned B.R. had the child been present. Father denied that he had burned Mother, but admitted to his home-based therapist that he had threatened to do so. The guardian ad litem reported that Father had been found hiding in Mother's home during a visit.

Houston reported that Father's participation in home-based therapy was inconsistent. Houston did not believe that Father would have participated at all if Houston had not stopped by to see Father, who was living with his mother. When Father failed to participate for a month, the service was closed as unsuccessfully completed. Houston recommended to Father that he receive domestic violence counseling in part because of his denial that a problem existed. At the time of the evidentiary hearing, Father continued to believe there were no domestic violence issues.

Additionally, Father failed to remedy his problems with substance abuse. He participated in outpatient substance abuse counseling from April to July of 2012 primarily for issues involving his marijuana use. Father was required to attend group therapy once a week, submit to random drug screens, and attend at least one Narcotics Nnonymous ("NA") or Alcoholics Anonymous ("AA") meeting each week. After Father had three absences he was placed on an attendance contract. Father completed his group therapy, but failed to attend the AA or NA meetings, violated his attendance contract, and was unsuccessfully

9

discharged from the program.

Father's home-based case manager, Jamie Denny ("Denny"), was assigned to help Father work on goals of finding stable housing and employment, and learning parenting skills. After the initial meeting with Denny, however, Father did not meet with her to work on those goals. Father failed to obtain employment, having last been employed in 2010, did not obtain housing, and did not make any strides in parenting B.R. Denny described Father's relationship with B.R. as lacking bonding. At the time of the evidentiary hearing, Father remained unemployed, had no housing for B.R. and himself, and was not bonded with B.R. Father has three other children who are not in his care and had only recently begun paying child support for two of those children, having made only four payments at the time of the evidentiary hearing. Even though Father had been advised to consistently visit B.R. and engage with him, Father preferred to complete his probation and community service before visiting B.R. or participating in services. Houston was concerned because Father did not talk about B.R. Father was unsuccessfully discharged from Denny's services in June 2012 and failed to take advantage of continued referrals for visitation services, which were made available until the date of the evidentiary hearing. B.R.'s last visit with Father was in April 2012.

The evidence presented to the juvenile court supports the court's conclusion that the conditions resulting in B.R.'s removal from Father's care and placement outside of his home will not be remedied. Father's arguments to the contrary are invitations to reweigh the evidence and reassess the credibility of witnesses, a task we are forbidden to undertake. *In re D.D.*, 804 N.E.2d at 265.

10

Although that basis alone would support the juvenile court's decision to terminate Father's parental rights to B.R., we address Father's argument that the juvenile court erred by concluding that a continuation of the parent-child relationship posed a threat to B.R.'s well-being.

We observe that the same evidence may be used to prove more than one element in these matters. *See In re A.K.*, 924 N.E.2d 212, 221 (Ind. Ct. App. 2010) (evidence establishing conclusion of threat to child's well-being also supports conclusion that termination is in child's best interest). Therefore, the evidence set out above also supports the trial court's conclusion that a continuation of the parent-child relationship posed a threat to B.R.'s well-being.

Father challenges the juvenile court's conclusion, contending that a continuation of his relationship with B.R. would not pose a threat to B.R.'s well-being. In support, he argues that he has signed up for a Fathers and Families program, he parents his other three children, he is compliant with the terms of his probation, he completed substance abuse classes and did not test positive for drugs, he has strong support from his mother, and that there is no reason to believe that he will not continue to participate in services. However, Father acknowledges that B.R. has bonded with Maternal Grandmother, and does not contest that termination is in B.R.'s best interests or that adoption by Maternal Grandmother was a satisfactory plan.

The juvenile court found that Father had not successfully addressed conditions that prevented reunification with B.R., finding that Father could not provide a safe and stable environment in which to raise B.R. or provide for his needs. Continuation of the parent-

child relationship would merely prolong the time that B.R. was without permanency. FCM Prather testified that she would be concerned for B.R.'s safety because of Father's threat to harm him. Father had not bonded with B.R., and Father had not obtained the skills to parent B.R. Father was unwilling to attend visits one hour each week. Mother's home-based therapist was of the opinion that Father needed counseling, anger management and domestic violence counseling before B.R. could be placed with him. Father's own home-based therapist stated that Father's behavior could be damaging to B.R. and could be emotionally traumatic. Father's therapist was concerned that even if Father's relationship with Mother ended, Father would use dangerous behavior in order to have his needs met.

A juvenile court must subordinate a parent's interests to those of the child. *In re J.S.*, 906 N.E.2d 226 (Ind. Ct. App. 2009). B.R. has been in Maternal Grandmother's care since November 2011 and is bonded with her.

We will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Father's parental rights to B.R. was clearly erroneous. We therefore affirm the juvenile court's judgment.

Affirmed.

ROBB, C.J., and RILEY, J., concur.

12